UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| Autoficio, LLC and Kapexia, LLC, § <br> § <br> Plaintiffs, § <br> § <br> v. § <br> § <br> Cimble Corp., Alvin Allen, and Paul § <br> Barrett, § <br> § <br> Defendants, § | Civil Action No. _____ <br><br> **JURY TRIAL DEMANDED** |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Autoficio, LLC and Kapexia, LLC file this Original Complaint against Cimble Corp., Alvin Allen, and Paul Barrett (collectively, "Defendants") for: (1) statutory fraud; (2) fraud; (3) negligent misrepresentation; and (4) breach of contract.

## PARTIES

1. Plaintiff Autoficio, LLC ("Autoficio") is, and at all times herein mentioned was, a limited liability company organized and existing under the laws of the State of Washington, with its principle place of business in Bellevue, Washington.

2. Plaintiff Kapexia, LLC, ("Kapexia") is, and at all times herein mentioned was, a Nevada Limited Liability company with its principle place of business in San Jose, Santa Clara County, California. Everything that is owned in Kapexia's name is beneficially owned by Autoficio.

3. On information and belief, Defendant Cimble Corporation ("Cimble"), is, and at all times herein mentioned was, a Texas "S" corporation, with its principle place of business in Liberty, Texas.

4. On information and belief, Defendant Alvin "Chuck" Allen ("Allen"), an individual, is, and at all times herein mentioned was, a Texas resident, and a shareholder of Defendant Cimble.

5. On information and belief, Defendant Paul Barrett ("Barrett"), an individual, is, and at all times herein mentioned was, a Massachusetts resident, and a shareholder of Defendant Cimble.

## SUBJECT MATTER JURISDICTION AND VENUE

6. The Court has jurisdiction over the subject matter of this dispute under 28 USC § 1332(a) because the parties are completely diverse and the amount in controversy includes damages greater than $75,000.

7. Venue is proper in this District under 28 USC § 1391(b)(2) and (3).

## FACTUAL BACKGROUND

**A. Defendants Represented Cimble's Value To Induce Plaintiffs To Invest In Cimble**

8. In 2014, Plaintiffs were searching for data analytics technology in the auto industry that processes information accumulated and relayed through the computer chips in automobiles. After research and investigation, Plaintiffs learned of Cimble, a company that purported to be working on technology to create predictive analytics based on information in an automobile's computer.

9. Plaintiffs became interested in partnering with Cimble in the development and use of Cimble's technology in a device Plaintiffs were trying to create. Plaintiffs approached Cimble and began discussions aimed at providing them with access to Cimble's technology.

10.     The discussions evolved into negotiations for Plaintiff Kapexia to purchase an interest in Cimble, but the parties had to agree on a valuation of Cimble before such a purchase could be made.

11.     Negotiations took place over several months, during which Cimble and its representatives made numerous representations about its value, and about the components that comprised the valuation.

12.     During the course of the negotiations, Defendants, and each of them, made multiple representations about the value of the business.  All of Defendants' statements regarding the Cimble valuation assured Plaintiffs that the value was in excess of $7 million.

13.     Defendants' representations during the negotiations included, but were not limited to, the following:

(a)     On May 5, 2014, Cimble sent to Brian Whiteside—Autoficio's sole member and manager—and others associated with Autoficio and Kapexia, a document entitled "Cimble's Estimated Enterprise Value" representing Cimble's "Total Enterprise Value" to be $8.25 million.  This value was represented to be based on, among other things, "Paid up LunarEYE Patent Royalties."

(b)     On or about May 19, 2014, Defendant Barrett sent to Plaintiffs a Cimble Corporate Presentation dated March 24, 2014, which contained a document entitled "Cimble's Estimated Enterprise Value" with a bottom line "Total Enterprise Value" of $7.6 million.

(c)     On June 9, 2014, Cimble sent to Plaintiffs a 60-page confidential document, dated June 6, 2014, entitled "Cimble Corporate Presentation."  This document represented Cimble's "Total Enterprise Value" to be $8.25 million.

    (d) On or about June 11, 2014, Defendant Barrett wrote in an email to Whiteside, forwarded by Defendant Allen, that the actual company was worth $7 million: "If you refer to either slide presentation that you have been sent (which are really different animals, and contain different line items) our base technology, platform development, IP and other assets actually stands at about $7.0M."

  14. Based on the representations by Defendants, and each of them, Plaintiffs and Defendants agreed that they would use a value of $4.2 million on Cimble.

  15. All of Defendants' statements regarding the Cimble valuation assured Plaintiffs that the value was in excess of $7 million and that Plaintiffs were getting a "deal" at the $4.2 million valuation.

**B. The Share Purchase Agreement, Memorandum Of Understanding, and Letter Of Credit**

  16. On August 7, 2014, Autoficio, through Kapexia, entered into a Share Purchase and Option Agreement ("the Share Purchase Agreement") with Cimble. The agreement was signed by Whiteside, on behalf of Kapexia, and Defendant Allen, on behalf of Cimble. A true and correct copy of the Share Purchase and Option Agreement, including its attached exhibits A & B, is attached hereto as Exhibit 1.

  17. The terms of the Share Purchase Agreement provided that Kapexia would purchase 7.14% of Cimble for an agreed upon price of $300,000, based on Cimble having a value of $4.2 million. The Share Purchase Agreement provided for additional periods in which Kapexia had the option to purchase additional shares of Cimble. The Share Purchase Agreement contained no terms requiring Kapexia to exercise such options in order to realize the benefits of the technology that Cimble was developing for Plaintiffs.

18. Through the Share Purchase Agreement Cimble represented and warranted, among other things, that "[t]here is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to [Cimble's] knowledge, currently threatened . . . to [Cimble's] knowledge, that would reasonably be expected to have, either individually or in the aggregate, a material adverse effect."

19. Kapexia made its payment of $300,000 for the purchase of the Cimble stock per the terms of the Share Purchase Agreement.

20. Simultaneous with the parties entering into the Share Purchase Agreement, the parties also entered into a Memorandum of Understanding ("MOU") which spelled out that the parties agreed to a Line of Credit Agreement ("LOC"), which was attached as Exhibit A to the MOU, and an agreement setting forth the "Party's Roles" ("PRA") attached as Exhibit B to the MOU. A true and correct copy of the MOU, with the LOC and PRA is attached hereto as Exhibit 2.

21. By the terms of the LOC, Kapexia agreed to lend Cimble $125,000, payable in five consecutive monthly installments beginning on August 15, 2014, with the money all to be used by Cimble in furtherance of the product development efforts requested by the Lender (Autoficio, through Kapexia), with the requirement that Cimble would document the use of all funds disbursed by reason of the LOC.

22. By the terms of the LOC, the entire principal sum of the note plus all interest accrued automatically becomes due and payable in the event of Cimble's failure to make payment due under the note or Cimble's failure to perform any agreement provisions contained in the LOC or in other documents or instruments delivered to Kapexia in connection with the LOC.  The LOC was to be secured by Cimble's assets.

23. The purpose of Kapexia's stock purchase was to provide capital to Cimble to focus on the development of a device Plaintiffs were interested in bringing to the market. Cimble represented development would be completed and the device fully launched by April 30, 2015. The beta of the device was supposed to be completed prior to the First Option due date of February 9, 2015. Assurances were also given that the device would be marketable in December, 2014 and later by January, 2015.

C. **Defendants' Misrepresentations Regarding Cimble's Value**

24. Defendant Cimble did not provide a marketable product by the date set forth in the timetable, and demanded additional money to complete the development, but Plaintiffs determined that Kapexia would not exercise its option to purchase additional shares under the Share Purchase Agreement.

25. Cimble was not as valuable or as solvent as it had claimed in its representations to Plaintiffs during the negotiations which led to the Share Purchase Agreement, which false representation continued during the executory phase of the agreement. Defendants, and each of them, repeatedly represented that Cimble had a value in excess of $7 million, with several valuable assets. But when Plaintiffs determined not to pick up the options to purchase additional shares in Cimble, Defendants, and each of them, subsequently advised Plaintiffs that Cimble was unable to continue working on the product, or to stay in business without the payments which would have been forthcoming had Kapexia exercised its option to purchase additional shares in the company.

26. For example, After Cimble essentially ceased operations allegedly because Kapexia refused to exercise its option to purchase additional shares, Cimble defaulted on payments due to Kapexia under the LOC. This was confirmed in an email dated August 4, 2016, wherein Defendant Allen wrote to Whiteside, "If your group had desired another outcome it was

totally in your sides [sic] power to exercise the first option in the Options Agreement that was clearly written and in place and thereby choosing to preserve the project AND the company."

27. In that same email dated August 4, 2016, Defendant Allen reiterated that it was only Plaintiffs' money keeping Cimble solvent and active, writing: "Cimble is now 110% deceased and never coming back. The Kapexia project is 1000% dead as far as this side is concerned . . . Nothing persists. Not the technology, the ideas, or the money. Cimble had no patents, trade secrets or other IP per say [sic] . . . Cimble was using the money you were paying for funding the company (Options) to fuel the company."

28. Defendants also misrepresented the value of IP in which Cimble held an interest. For example, as early as May 5, 2014 and continuing through to the parties' execution of the Share Purchase Agreement, LOC, and MOU, Cimble represented its inflated valuation was based in part on its right to "LunarEYE" patent royalties. Yet while Defendants were ascribing Cimble value to LunarEYE patent royalties, and unbeknownst to Plaintiffs, third parties commenced administrative proceedings at the United States Patent and Trademark Office ("PTO") challenging the validity of U.S. Patent No. 6,484,035 B2 ("the '035 patent") owned by LunarEye, Inc. Those proceedings ultimately resulted in invalidation of claims 1-24 of the '035 patent.

29. On information belief, the '035 patent was the source of the "LunarEYE patent royalties" Defendants touted, Defendants knew the administrative proceedings challenging the '035 patent's validity had been commenced, and Defendants intentionally withheld the existence of those proceedings from Plaintiffs to further their scheme to induce Plaintiffs to invest in Cimble because they knew the claims of the '035 patent were highly likely to be found invalid.

30. Defendants' failure to disclose the PTO proceedings and their significance to Plaintiffs was a breach of their obligations, and violated Cimble's warranties under the Share

Purchase Agreement. Defendants knew Cimble's warranties were false at the time they were made.

31. Plaintiffs relied upon Defendants' above-described misrepresentations and failures to disclose.

## CAUSES OF ACTION

**COUNT 1: STATUTORY FRAUD – TEX. BUS. & COM. CODE § 27.01.**

32. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

33. Kapexia entered into a transaction involving stock that culminated with its purchase of ownership interest in Cimble.

34. During this transaction, and as described more fully above, Defendants made multiple, false representations of material facts to Plaintiffs, and failed to disclose material facts when they had a duty to do so. In the alternative, Cimble benefitted by not disclosing that its agents and/or employees' representations to Plaintiffs were false, and by failing to disclose material facts when it had a duty to do so.

35. Defendants' false representations and failures to disclose were made for the purpose of inducing Kapexia to enter into a contract to purchase ownership interest in Cimble.

36. Plaintiffs relied on Defendants' false representations and failure to disclose material facts by entering into a contract to purchase ownership interest in Cimble.

37. Plaintiffs' reliance on Defendants' false representations and failure to disclose material facts caused them injury, including actual damages.

38. Because Defendants made false representations to Plaintiffs with actual awareness of their falsity, Plaintiffs also seeks to recover exemplary damages. In the alternative, because Cimble had actual awareness of the falsity of representations made by its agents to Plaintiffs,

Cimble did not disclose the falsity of the representations to Plaintiffs, and Cimble benefitted from the false representations, Plaintiffs seek to recover exemplary damages.

**COUNT 2:  FRAUD.**

39. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

40. Defendants made false representations to Plaintiffs and failed to disclose material facts when they had a duty to do so.

41. Defendants' representations were material, and they were false.

42. Defendants' failures to disclose were material, and render Kapexia's entering into the Share Purchase Agreement, MOU, and LOC inherently unfair.

43. When Defendants made the representations to Plaintiffs, they knew they were false.  In the alternative, Defendants made the representations recklessly, as positive assertions, and without knowledge of their truth.

44. Defendants made the representations with the intent Plaintiffs act in reliance on them by having Kapexia enter into the Share Purchase Agreement, MOU, and LOC, or having reason to expect Plaintiffs would act in reliance on them by having Kapexia enter into the Share Purchase Agreement. MOU, and LOC.

45. Plaintiffs justifiably relied on Defendants' representations and failures to disclose. Before Kapexia entered into the Share Purchase Agreement, MOU, and LOC, Plaintiffs did not know Defendants' representations were false nor were they aware of facts indicating they were false, and Plaintiffs were not aware of the material information Defendants failed to disclose.

46. Defendants' false statements and failures to disclose caused Plaintiffs' injury, including actual damages.

47. Plaintiffs also seek to recover exemplary damages.

**COUNT 3: NEGLIGENT MISREPRESENTATION.**

48. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

49. Defendants made representations to Plaintiffs in the course of their business or in a transaction in which they all had an interest, including but not limited to representations regarding Cimble's value and the basis thereof.

50. Defendants' representations were false.

51. Defendants' representations were given to guide Plaintiffs in their decision to invest in Cimble.

52. Defendants did not exercise reasonable care obtaining or communicating the information given to Plaintiffs.

53. Plaintiffs justifiably relied on Defendants' representations, and were injured as a result of their reliance on Defendants' representations.

**COUNT 4: BREACH OF CONTRACT.**

54. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

55. As alleged herein above, Kapexia and Cimble entered into the Share Purchase Agreement and LOC.

56. Pursuant to the LOC, Kapexia disbursed $125,000 to Cimble.

57. Cimble agreed to use all funds disbursed pursuant to the LOC in furtherance of the product development efforts requested by Plaintiffs, and that it would document the use of all funds disbursed pursuant to the LOC, and to pay back the funds loaned.

58. Kapexia has fully performed its obligations under the LOC and the Share Purchase Agreement, including distributing the entire amount of the $125,000 in accord with the terms of the LOC.

59. Defendant Cimble breached the LOC by defaulting on its payment obligations under the LOC.

60. On information and belief, Defendant Cimble also breached its obligations under the LOC by failing to use all funds disbursed pursuant to the LOC in furtherance of the product development efforts requested by Plaintiffs, and, on information and belief, by failing to document the use of all funds disbursed pursuant to the LOC.

61. On information and belief, Defendant Cimble also breached its representation and warranty in the Share Purchase Agreement that there was no proceeding pending that would reasonably be expected to have a material adverse effect by failing to disclose the existence of the proceedings at the PTO initiated to invalidate claims of the '035 patent.

62. As a proximate result of Defendant Cimble's breaches of contract, Kapexia has been damaged.

## DEMAND FOR JURY TRIAL

63. Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

64. For the foregoing reasons, Plaintiffs respectfully requests judgment against Defendants for the following:

 (a) Actual damages;

 (b) Exemplary damages, uncapped pursuant to Texas Civ. Prac. & Rem. Code § 41.008(c)(11) because Defendants secured execution of the Share Purchase Agreement and LOC by deception;

 (c) An accounting and return of monies due and owing to Plaintiffs;

 (d) Attorneys' fees for Defendants' statutory fraud and breaches of contract;

(e) Costs, including costs of court;

(f) Pre-judgment and post-judgment interest at the highest rate(s) allowed by law; and

(g) Such other and further relief, at law or in equity, to which Plaintiffs may show themselves to be justly entitled.

Dated: June 8, 2017

Respectfully submitted,

**GRIFFITH BATES CHAMPION & HARPER LLP**

*/s/ Casey Griffith*
Casey Griffith
Texas Bar No. 24036687
Casey.Griffith@griffithbates.com
----
Michael Barbee
Texas Bar No. 24082656
Michael.Barbee@griffithbates.com
----
5910 N Central Expressway, Suite 1050
Dallas, Texas 75206
214-238-8400 | Main
214-238-8401 | Fax

-and-

Joseph J. Mastrogiovanni, Jr.
**MASTROGIOVANNI MERSKY & FLYNN, P.C.**
2001 Bryan Street, Suite 1250
Dallas, Texas 75201
(214) 922-8800
(F) (214) 922-8801
jmastro@mastromersky.com

**COUNSEL FOR PLAINTIFFS**