IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **AUTOFICIO, LLC and BRIAN WHITESIDE,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No.: 4:17-cv-00404-KPJ** |
| | § | |
| **CIMBLE CORP., ALVIN ALLEN, and PAUL BARRETT,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants Cimble Corp. ("Cimble"), Alvin Allen ("Allen"), and Paul Barrett's ("Barrett") (collectively, "Defendants") Motion for Summary Judgment (the "Motion") (Dkt. 137). Plaintiffs Brian Whiteside and Autoficio, LLC (together, "Plaintiffs") filed a response (Dkt. 142), Defendants filed a reply (Dkt. 149), and Plaintiffs filed a sur-reply (Dkt. 150). On April 9, 2020, the Court held a telephonic hearing to address the Motion. *See* Dkt. 192. Upon review of the pleadings and the relevant law, the Court finds that Defendant's Motion (Dkt. 137) is **GRANTED IN PART** and **DENIED IN PART**.

## I.     BACKGROUND

Plaintiffs Brian Whiteside ("Whiteside") and Autoficio, LLC ("Autoficio") (collectively, "Plaintiffs") bring this suit against Defendants alleging claims for: (1) breach of contract; (2) common law fraud; (3) statutory fraud; and (4) negligent misrepresentation. *See* Dkt. 70 at 1.

## A.  FACTUAL BACKGROUND

### 1.  Negotiations

In 2014, Whiteside sought investment opportunities and learned that Cimble, an automobile technology company, was seeking investors. *See* Dkt. 142-2 at 16–17. Joe Perez ("Perez"), one of Whiteside's business partners from a previous investment, introduced Whiteside to Trevor Zink ("Zink"). *See* Dkt. 137-1 at 17. Perez  subsequently introduced Whiteside and Zink to Cimble and Allen. *See id.* Together, Whiteside, Zink, and Perez began negotiating with Cimble regarding investment opportunities. *See id.* at 25. These negotiations revolved around Whiteside, Zink, and Perez collectively purchasing an interest and investing in Cimble in exchange for Cimble's development of a product for them to market. *See* Dkt. 114 at 3–4.

On May 1, 2014, Perez and Zink created Kapexia, LLC ("Kapexia") as a California member managed limited liability company as co-equal managers of the company. *See* Dkt. 137-1 at 5. Perez and Zink constructed Kapexia to be a vehicle through which they would invest in Cimble together with Whiteside. *See id.* at 4. Although Whiteside was never a member or manager of Kapexia, *see id.* at 6, Whiteside testified that it was Kapexia's "intent" for him to become a manager at a later date. *See* Dkt. 142-6 at 5.

On June 6, 2014, Allen delivered a PowerPoint presentation (the "Presentation") to Whiteside and Perez in San Francisco regarding potential product development between Kapexia and Cimble. *See* Dkt. 142-4 at 32–33. Both Allen and Barrett drafted the Presentation. *See* Dkt. 142-6 at 6. In the Presentation, Cimble was represented as having a "Total Enterprise Value" of $8.25 million. Dkt. 137-5 at 19. Barrett testified that this was a mistake, and the Total Enterprise Value should have been $7.25 million. *See* Dkt. 137-6 at 6–7. In representing the Total Enterprise

Value, the Presentation shows that Cimble had "Paid up LunarEYE Patent Royalties (based on 1st 100K units [at] $5)" as an asset worth $500,000.00. Dkt. 137-5 at 19.

On June 12, 2014, Allen stated in an email to Barrett, "I think a much cleaner way to do this is for Cimble to internally have an asset sale. At this time Cimble really is essentially DOA. I just moved out of the Liberty offices to a 12x30 storage shop in my yard." Dkt. 142-12 at 2.

### 2.     <u>The Agreements</u>

Kapexia and Cimble agreed to a Share Purchase and Option Agreement (the "SPA") on August 7, 2014. *See* Dkt. 70-1. The SPA was signed by Whiteside on behalf of Kapexia and Allen on behalf of Cimble. *See id*. at 8. Allen signed his name and the date under the line marked "Company" and Whiteside signed his name below "Purchaser: Kapexia, LLC," and following his signature was the typed language,

> Brian Whiteside, Manager
> Address: 100- 116th Ave SE
> Bellevue, WA 98004.

Dkt. 70-1 at 8. As part of the SPA, Kapexia and Cimble agreed:

> 2.4     Litigation. There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's knowledge, currently threatened (i) against the Company or any officer, director or key employee of the Company; or (ii) to the Company knowledge, that questions the validity of this Agreement or the right of the Company to enter into the Agreement, or to consummate the transactions contemplated by the Agreement; or (iii) to the Company's knowledge, that would reasonably be expected to have, either individually or in the aggregate, a material adverse effect.

*Id*. at 4–5. There is no provision in the SPA that specifies how Cimble must spend the funds delivered under the SPA. *See* Dkt. 142 at 12.

A Memorandum of Understanding ("MOU") was reached simultaneously with the SPA, which included a Line of Credit Agreement ("LOC") and an agreement setting forth the "Party's

Roles" ("PRA").[1] *See* Dkt. 70-2. Under the LOC, Kapexia agreed to lend Cimble $125,000.00, payable in five consecutive monthly installments, and Cimble agreed to "use all funds disbursed pursuant to this Note in furtherance of the product development effects requested by [Kapexia]." *See* Dkt. 70-2 at 4. The LOC states that if Kapexia "does not elect to exercise both of the 6 Month Option and 18 Month Option in the parties' [SPA]" and "fails to bring the developed product contemplated between the parties to market after its completion, then the balance due under this Note shall be converted to equity in [Cimble] without any additional shares being issued to [Kapexia]." Dkt. 70-2 at 4.

On August 20, 2014, less than two weeks after signing the Agreements, Whiteside formed Autoficio. *See* Dkt. 137-3 at 5. According to Whiteside, after signing the Agreements, Zink, Perez, G.B. Conley ("Conley"), a potential member in Kapexia, and himself decided that Whiteside should form Autoficio to invest in Cimble as Kapexia. *See* Dkt. 137-3 at 5–6; Dkt. 155-1 at 15, 27. Thus, they allegedly agreed that Autoficio, not Kapexia, would make the payments due under the Agreements to Cimble, and that Autoficio was "one and the same" with Kapexia. *Id.* at 28. Whiteside testified that once Autoficio "hit benchmarks," Perez and Zink intended to become members of Autoficio. *Id*. To date, Whiteside is the sole member of Autoficio. *See* Dkt. 137-1 at 16.

Under the SPA, Whiteside, on behalf of Kapexia, paid Cimble $300,000.00, in exchange for 7.14 percent of the issued shares in Cimble. *See* Dkt. 70-1 at 2; Dkt. 137-1 at 20. Under the MOU, Whiteside made a payment of $25,000.00, and Autoficio made the remaining payments totaling $100,00.00. *See* Dkt. 137-1 at 20–21.

---

[1] The Court will refer to the SPA, MOU, LOC, and PRA collectively as the "Agreements."

One week after Whiteside paid Cimble the $300,000.00 due under the SPA, Allen paid himself $237,000.00 of those funds to pay down his personal line of credit. *See* Dkt. 142-4 at 44–45. Allen testified that Cimble did not disclose the timing of paying off Cimble's debt to Kapexia or Whiteside. *See id*. at 45.

After the Agreements were signed, one of the LunarEYE patents for which Cimble held a paid-up royalty was invalidated through an Inter Partes Review petition ("IPR Petition"). *See* Dkt. 77-8 at 69. Allen testified that he knew about the pending IPR Petition prior to signing the Agreements. *See* Dkt. 142-4 at 8.

Cimble ultimately did not deliver a completed product. *See* Dkt. 142-4 at 50. Kapexia elected not to exercise the 6-month option or the 18-month option under the SPA. *See* Dkt. 142 at 11. On August 20, 2015, Kapexia ceased all operations and "any continuing product development or support by vendors" for the Cimble project. *See* Dkt. 142 at 9. While Allen testified that he has not yet closed Cimble, Cimble is no longer an operating business. *See* Dkt. 114 at 2; Dkt. 142-4 at 48. The parties dispute whether Kapexia or Cimble breached the MOU and SPA after payments pursuant to the Agreements were made. *See* Dkt. 137 at 30–33; *see also* Dkt. 142 at 40–42.

## B.  PROCEDURAL HISTORY

This case was originally filed by Autoficio and Kapexia against Defendants asserting diversity jurisdiction. *See* Dkt. 1. Defendants filed a Motion to Dismiss. *See* Dkt. 11. Autoficio and Kapexia then filed a First Amended Complaint, *see* Dkt. 13, and Defendants filed a second Motion to Dismiss. *See* Dkt. 23. On January 8, 2018, an order of referral was entered referring this matter to the undersigned for pretrial proceedings. *See* Dkt. 51. On January 25, 2018, the parties were ordered to file supplemental briefing setting forth the basis, or lack thereof, for the Court's jurisdiction over this case, *see* Dkt. 58, and all parties filed briefing. *See* Dkts. 61, 63, 65, 66.

Subsequently, Plaintiffs filed a Second Amended Complaint in which Kapexia was removed and Brian Whiteside was added as a Plaintiff.[2] *See* Dkt. 70. Defendants then filed a third Motion to Dismiss. *See* Dkt. 77. On October 12, 2018, this matter was referred to the under-signed for all further proceedings by consent of the parties. *See* Dkt. 108. On December 4, 2018, the Court denied Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint. *See* Dkt. 113.

Defendants filed the Motion on November 22, 2019. *See* Dkt. 137. Trial in this matter was scheduled to begin March 2, 2020. *See* Dkt. 148. On February 29, 2020, the parties filed a joint motion to continue trial and requested that the Court rule on the Motion prior to trial. *See* Dkt. 187. The Court granted the motion to continue and rescheduled trial for April 13, 2020. *See* Dkt. 186. Due to the COVID-19 pandemic, however, the trial was postponed. *See* Dkt. 188; General Standing Order 20-03 Regarding Court Operations Under Exigent Circumstances Created by the COVID-19 Pandemic. On April 9, 2020, the Court held a telephonic hearing on the Motion. *See* Dkt. 192.

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999).  The appropriate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

---

[2] Defendants attached to their reply in support of their second Motion to Dismiss (Dkt. 38) affidavits of Perez, Conley, and Ken Ronshausen, in which all three state that Kapexia is not a willing plaintiff in this suit. *See* Dkts. 38-1, 38-2, 38-3. Perez is currently business partners with Barrett. *See* Dkt. 129 at 5. Plaintiffs subpoenaed Perez in mid-2018, but Perez allegedly avoided service on multiple occasions. *See id*. Defendants listed Perez as a witness they "will call" at trial and Conley as a witness they "may call." Dkt. 152-2 at 6. On February 24, 2020, at the Final Pretrial Conference, the Court ruled that Perez and Conley, who also allegedly avoided service by Plaintiffs, would not be permitted to testify at trial unless they made themselves available for deposition prior to trial. *See* Dkt. 180.

The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). In sustaining this burden, the movant must identify those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case. *Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996).

In response, the nonmovant "may not rest upon mere allegations contained in the pleadings but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record to show there is a genuine issue for trial. *Stults*, 76 F.3d at 655. The citations to evidence must be specific, as the district court is not required to "scour the record" to determine whether the evidence raises a genuine issue of material fact. E.D. TEX. LOCAL R. CV-56(d). Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden. *Stults*, 76 F.3d at 655.

## III.     ANALYSIS

### A.  BREACH OF CONTRACT CLAIMS

"To recover for breach of contract, one must show: (1) the existence of a valid contract; (2) the performance or tendered performance by the plaintiff; (3) breach of contract by the

defendant; and (4) damages to the plaintiff as a result of the breach." *Steele v. Green Tree Servicing, LLC*, Case No. 3:09-CV-0603-D, 2010 WL 3565415, at *4 (N.D. Tex. Sept. 7, 2010) (citations omitted); *see Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 55 (Tex. App.—Dallas 2006, *pet. denied*). "The elements of a valid contract are (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) mutual consent to the terms; and, in the case of a written contract, (5) execution and delivery of the contract with the intent that it be mutual and binding." *Permison v. Morris*, No. 01-18-00392-CV, 2019 WL 5556576, at *5 (Tex.App.—Houston [1st Dist.] Oct. 29, 2019, no pet. h.) (citing *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex.App.—Houston [1st Dist.] 2007, no pet.)).

Defendants argue summary judgment should be granted as to Plaintiffs' breach of contract claims because (1) Plaintiffs cannot enforce the Agreements as they cannot show privity of contract; (2) the terms of the SPA preclude Plaintiffs from enforcement; (3) Kapexia failed to perform conditions precedent under the Agreements; and (4) Kapexia represented that Cimble would not have to pay the balance due under the LOC if Kapexia did not exercise the 6-month option under the SPA. *See* Dkt. 137 at 19.

### 1. **Privity of Contract**

"Under Texas law, '[t]he general rule is that one who contracts as [an] agent cannot maintain an action, in his own name and right, upon the contract.'" *Kakabadze v. M5 Int'l Co.*, Case No. H-12-3701, 2014 WL 2547767, at *3 (E.D. Tex. June 5, 2014) (quoting *Tinsley v. Dowell*, 26 S.W. 946, 948 (Tex. 1894)). In Texas, courts recognize an exception to the general rule that agents cannot maintain an action in their own name where the agent has an interest in the underlying contract. *See Kakabadze*, 2014 WL 2547767, at *3; *Tinsley*, 26 S.W. at 948; *Wilson County Peanut Co. v. Hahn*, 364 S.W.2d 468, 470 (Tex. Civ. App.—San Antonio 1963, no writ);

*see also Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 259 (5th Cir. 1980) ("The circumstances in which the courts of Texas expressly recognize an agent's right to sue in his own name— . . . (4) where he has an interest in the subject matter of the contract, . . . —suggest, however, that an agent  who is a party promisee may sue in his own name."). An interest in the underlying contract can arise when the agent proves he has an agreement with the principal or when the agent advances funds or makes payments under the contract. *See id.*; *Perry*, 16 S.W.3d at 187; *Harper v. Welchem, Inc.*, 1992 WL 198620, at *2 (Tex. App.—Houston [14th Dist.] 1992) (collecting cases).

Defendants argue there is no privity of contract among the parties as Plaintiffs are not parties to the Agreements. *See* Dkt. 137 at 24. Defendants further argue that no exception to the requirement of privity applies because Whiteside could not have been an agent of Kapexia under California law when he signed the Agreements. *See id.* at 25. Additionally, Defendants argue Autoficio could not be an agent of Kapexia because Autoficio was not in existence when the Agreements were signed. *See id.* at 26. Plaintiffs argue that Whiteside contracted with Cimble as an agent of Kapexia, and thus, Whiteside may recover for breach of contract against Defendants. *See* Dkt. 142 at 30.  Further, Plaintiffs argue that Autoficio was created at the direction of Kapexia, and thus, is an agent of Kapexia and can recover for breach of the Agreements. *See* Dkt. 192. In denying Defendants' Motion to Dismiss (Dkt. 77) the Court found that, assuming Plaintiffs were agents of Kapexia, Plaintiffs may assert a breach of contract claim against Defendants because they had an interest in the Agreements (arising from the payments Plaintiffs made under the SPA and LOC). *See* Dkt. 113 at 14. As the parties do not dispute that Whiteside and Autoficio contributed funds due under the Agreements, summary judgment is precluded on Plaintiffs' breach

of contract claim if Plaintiffs have established a genuine issue of material fact as to whether Whiteside and/or Autoficio acted as Kapexia's agents. *See Kakabadze*, 2014 WL 2547767, at *3.

Defendants argue that California law controls whether Whiteside and Autoficio can be agents of Kapexia under Section 101.462 of the Texas Business Organization Code. *See* Dkt. 149 at 10. Section 101.462 of the Texas Business Organization Code states, "[i]n a derivative proceeding brought in the right of a foreign limited liability company, the matters covered by this subchapter are governed by the laws of the jurisdiction of formation of the foreign limited liability company." TEXAS BUS. ORG. CODE § 101.462. As this suit is not a derivative suit and does not concern the formation of Kapexia, the Court finds that Texas law controls the existence of an agency relationship in this context.

a.  Agency Relationship

"An agent is one authorized by another to transact some business for the principal; the relationship is a consensual one between two parties, by which one party acts on behalf of the other, subject to the other's control." *Jamison v. Nat'l Loan Investors, L.P.*, 4 S.W.3d 465, 468 (Tex.App.—Houston [1st Dist.] 1999, pet. denied). "Authorization to act and control of the action are the two essential elements of agency." *Reliant Energy Services, Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 783 (Tex.App.—Houston [1st Dist.] 2011, no pet.) (citing *Gonzales v. Am. Title Co.*, 104 S.W.3d 588, 593 (Tex.App.—Houston [1st Dist.] 2003, pet. denied)). "The law does not presume agency, and the party asserting agency has the burden to prove it." *Id.* (citing *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007)). "An agent's authority to act on behalf of a principal depends on words or conduct by the principal either to the agent (actual authority) or to a third-party (apparent authority)." *Id.* (citations omitted).

10

"Actual authority includes both express and implied authority." *Id*. An agent's actual authority to act on behalf of a principal depends on words or conduct by the principal to the agent. *See id*. "Express authority is delegated to an agent by words of the principal that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal." *Id*. Implied authority is "the authority of an agent to do whatever is necessary and proper to carry out the agent's express powers." *Reliant Energy Services*, 336 S.W.3d at 783. Therefore, implied agency exists "only as an adjunct to express actual authority; an agent that does not have express authority cannot have implied authority." *Id*. "In order to prove actual authority, therefore, there must be evidence that either (1) the principal intentionally conferred authority on another to act as its agent, or (2) the principal intentionally, or by a want of due care, allowed another to believe that it possessed authority to act as the principal's agent." *Id*. Therefore, courts are to "examine the words and conduct by the principal to the alleged agent regarding the alleged agent's authority to act for the principal." *Id*.

"Apparent authority is the power of an agent to affect the legal relations of the principal by transactions with a third person." *Id*. (citing *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984)). As apparent authority is based on estoppel, only the conduct of the principal in leading a third party to believe that the agent has authority may be considered. *See Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). Therefore, courts look to "acts of participation, knowledge, or acquiescence by the principal" in deciding whether the agent had apparent authority to act. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 672 (Tex. 1998). "Apparent authority arises either from (1) a principal knowingly permitting an agent to hold himself out as having authority, or (2) a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority,

thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise." *Reliant Energy Services*, 336 S.W.3d at 784 (citing *Gaines*, 235 S.W.3d at 182).

    b.   <u>Whiteside</u>

        Defendants argue Whiteside could not be an agent of Kapexia under California law because he was not a manager or member of Kapexia when he signed the SPA and LOC. *See* Dkt. 137 at 25–28. Plaintiffs argue Whiteside had actual and implied authority as an agent of Kapexia to sign the SPA and LOC. *See* Dkt. 142 at 35.

        In the Motion and at the Hearing, Defendants argue that only a member manager may sign a contract or make decisions on behalf of a California member-managed limited liability company under California law.[3] Defendants cite to California Corporate Code Sections 17704.08(d)(2) and 17713.12(e)(2) in support of their argument. *See* Dkt. 149 at 10. Even if California law controlled Kapexia's formation of an agency relationship, neither of these statutes appears to preclude Whiteside from acting as an agent of Kapexia. Section 17704.08(d)(2) concerns indemnification and insurance, and states that for the purpose of that subdivision, "agent" is defined as "any person who is or was a member of a member-managed limited liability company, manager of a manager-managed limited liability company, officer, employee, *or other agent of the limited liability company*. . . ." Cal. Corp. Code § 17704.08(d)(2) (emphasis added). Section 17713.12(e)(2) defines an agent of a California limited liability company as "a person or entity authorized by the limited liability company to make representations to the public about the limited liability company's financial condition and who is acting within the scope of the agency when the representations are made." *Id*. at § 17713.12(e)(2). Neither of these statutes prohibit a California limited liability company from creating an agency relationship with someone who is not a manager

---

[3] In the Motion, Defendants cite to "California Corporate Statutes 177301.1 (effective Jan. 1, 2014)" to support this argument. However, this is not a valid statute under California law.

or a member. As the Court has found no California law precluding Kapexia from having an agent that is not a member or manager, the Court will analyze whether Plaintiffs have established a genuine issue of material fact as to whether Whiteside was an agent of Kapexia when he signed the SPA and LOC under Texas common law.

Plaintiffs have provided evidence that Zink sent an email to Barrett and Allen and copied Whiteside, which stated, "we decided to have [Whiteside] sign all the documents, so I made those changes and obtained [Whiteside's] signature." Dkt. 142-19 at 2. This email evinces that a member of Kapexia designated Whiteside to sign the Agreements on Kapexia's behalf. *See Reliant Energy Services*, 336 S.W.3d at 783 ("Express authority is delegated to an agent by words of the principal that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal."). Hence, Plaintiffs have established a genuine issue of material fact as to whether Whiteside had express authority to sign the Agreements on Kapexia's behalf.

Additionally, Plaintiffs argue Whiteside had implied authority to sign the Agreements because he was "well-ingratiated in the business dealings" of Kapexia and Cimble. *See* Dkt. 142 at 37–38. Whiteside was heavily involved in the negotiation process with the members of Kapexia, as well as with Defendants. *See* Dkt. 137-1 at 25. As Barrett testified, everyone involved in the negotiations knew that Whiteside would be providing the funds due under the Agreements. *See* 142-2 at 19–20. These actions tend to show that Whiteside may have had implied authority to execute the Agreements as an extension of his express powers of negotiating and carrying out the Agreements. *See Reliant Energy Services*, 336 S.W.3d at 783. Accordingly, the Court finds that a genuine issue of material fact exists as to whether Whiteside had implied authority to sign the Agreements.

Based on the evidence identified above, the Court finds that Plaintiffs have established a genuine issue of material fact as to whether Whiteside acted as an agent of Kapexia.

   c.  <u>Autoficio</u>

Defendants argue Autoficio cannot be in privity of contract with Kapexia because it was not formed until after the Agreements were signed. *See* Dkt. 137 at 26. Plaintiffs argue Autoficio was formed at the direction, and to serve the needs, of Kapexia, and thus, Plaintiffs argue Autoficio acted as an agent in performing under the Agreements. *See* Dkt. 192.

Here, it is undisputed that Autoficio made four payments of $25,000.00 each to Cimble as due under the LOC. *See* Dkt. 70-2 at 4; Dkt. 142-11 at 8–16. Cimble's bank records list each of these four payments as "Domestic Wire Deposit WIRE IN AUTOFICIO LLC." Dkt. 142-11 ar 8-16. Further, Whiteside testified that he formed Autoficio at the direction of Conley, Perez, and Zink when they decided investing in Cimble through Kapexia would hurt their ability to sell any product developed by Cimble. *See* Dkt. 155-1 at 15, 27–28. Thus, a reasonable jury could find that Kapexia intentionally conferred authority on Autoficio to act as its agent in paying the funds due under the Agreements. *See Reliant Energy Services*, 336 S.W.3d at 783. Therefore, the Court finds that a genuine issue of material fact exists as to whether Autoficio was an agent of Kapexia.

As a genuine issue of material fact exists as to whether Plaintiffs acted as agents of Kapexia, the Court finds that a genuine issue of material fact exists as to whether Plaintiffs were in privity of contract with Cimble.

   **2.**  **<u>Contract Terms</u>**

When interpreting a contract, courts must "focus on the language used in the contract because it is the best indication of the parties' intent." *Reliance Inc. Co. v. Hibdon*, 333 S.W.3d 364, 369 (Tex.App.—Houston [14th Dist.] 2011, pet. denied). Courts must "examine the entire

contract in an effort to harmonize and effectuate all of its provisions so that none are rendered meaningless." *Id.* (citing *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006)). Courts "may not rewrite the contract or add to its language under the guise of interpretation." *Id.*

"A mere disagreement about interpretation does not render a contract ambiguous," as a contract is only ambiguous if it is "susceptible to more than one reasonable interpretation." *Reliance Ins.*, 333 S.W.3d at 369. Determining whether contract language is ambiguous presents a question of law. *See id.* "However, if the parties' intentions as expressed in the document are indefinite and unclear, ambiguity exists, and the issues of contract formation and intent to be bound become questions of fact." *Karns v. Jalapeno Tree Holdings, L.L.C.*, 459 S.W.3d 683, 690 (Tex.App.—El Paso 2015, pet. denied).

Defendants argue summary judgment should be granted as to Plaintiffs' breach of contract claim because the language of the SPA precludes Plaintiffs' claims. *See* Dkt. 137 at 28. The relevant sections of the SPA state:

> 3.    <u>Representations and Warranties of the Purchasers</u>. Purchaser hereby represents and warrants to the Company, that:
>
> 3.1    <u>Purchase Entirely for Own Account</u>. This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the shares to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the acquired shares. The Purchaser has not been formed for the specific purpose of acquiring the shares.
>
> …

4.2  <u>Successors and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

Dkt. 70-1 at 5–7. Defendants argue these provisions of the SPA, when read together, unambiguously show that non-signatories cannot sue to enforce the SPA. *See* Dkt. 137 at 29.

The Court does not find that these provisions unambiguously remove Plaintiffs' ability to assert a breach of contract claim under the SPA. Section 3.1 is a representation by Kapexia that the purchased shares were not intended to be resold or transferred. *See* Dkt. 70-1 at 5–6. The text of Section 3.1 does not limit who may seek relief based on the SPA. *See id.* Moreover, Section 4.2 does not appear to expressly preclude parties in privity of contract from seeking relief under the SPA. *See id.* at 7. While Defendants argue that similar clauses have led courts to dismiss breach of contract claims made by non-signatories, those cases involved plaintiffs alleging to have third-party beneficiary status. *See MCI Telecommunications Corp. v. Texas Utilities Elec. Corp.,* 995 S.W.2d 647, 651 (Tex. 1999); *Fomento de Construcciones y Contratas, S.A. v. Verolube, Inc.*, Case No. 4:14-CV-2199, 2015 WL 1235738, at *2 (S.D. Tex. March 13, 2015). As discussed above, the Court finds that Plaintiffs have established a genuine issue of material fact as to whether Plaintiffs were in privity of contract with Defendants. Further, Barrett testified that Defendants knew Whiteside was "contributing funds" due under the SPA. *See* Dkt. 142-2 at 20. Had the parties wanted to preclude anyone but Kapexia from enforcing the SPA, the parties could have made that clear in the language of the SPA. *See Tenneco Inc. v. Enterprise Products Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained.").

16

### 3.  __Performance of Conditions Precedent__

"A party's nonperformance of a contract will be excused when that party's performance is prevented by the other party." *Sgroe v. Wells Fargo Bank, N.A.*, 941 F.Supp.2d 731, 746 (E.D. Tex. 2013) (citing *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex.App.—Houston [1st Dist.] 2003, pet. denied)).

Defendants argue Kapexia failed to bring a developed produce to market and failed to exercise its share purchase options under the SPA, and thus, Defendants were not required to pay the balance due under the LOC. *See* Dkt. 137 at 30. Specifically, Defendants argue Kapexia failed to supply Cimble with a Marketing Requirements Document for the product and failed to fund the User Interface/User Experience components of the project as required under the MOU. *See id*. at 32.

Plaintiffs do not dispute that Kapexia did not exercise either the 6-month or 18-month share purchase options. *See* Dkt. 137-1 at 119. Rather, Plaintiffs argue the LOC only required Kapexia to bring the product to market after its completion, and Cimble failed to complete the product. *See* Dkt. 142 at 41. Additionally, Plaintiffs argue the MOU did not specify timeframes for Kapexia to provide Cimble with a Marketing Requirements Document and the User Interface/User Experience component funding, and Cimble would not have completed the product anyway due to its inability to fund the purchase of diagnostic codes. *See id*. at 42.

Under the LOC, Cimble must repay the amounts due if Kapexia exercises the 6-month and 18-month share purchase options under the SPA and brings "the developed product contemplated between the parties to market after its completion." Dkt. 70-2 at 4. Allen testified that by February 2015, Cimble had not created a marketable product for Kapexia to market. *See* Dkt. 142-4 at 50. Allen testified that the product could have gone to market if Cimble had the diagnostic codes, but

they did not have the funds to buy the codes. *See id*. at 51. Therefore, the Court finds that there is a genuine issue of material fact as to whether any failure to perform by Kapexia under the MOU caused Cimble's failure to perform or whether Cimble's breach of the SPA was unrelated to any action by Kapexia.

### 4.  Previous Representations

"When parties have entered into a valid, written, integrated contract, the parol evidence rule precludes enforcement of any prior or contemporaneous agreement that addresses the same subject matter and is inconsistent with the written contract." *West v. Quintanilla*, 573 S.W.3d 237, 243 (Tex. 2019). Defendants argue that Zink, on behalf of Kapexia, represented in an email prior to the signing of the SPA that Cimble would not have to repay the amounts due under the LOC if Kapexia failed to exercise the 6-month and 18-month share purchase options under the SPA. *See* Dkt. 137 at 34. The email from Barrett to Zink states, in relevant part:

> Finally, and just to be clear, on the LOC, where it talks about the $125K being converted to equity without shares being issued, I want to confirm that just means that Brian's cost basis for the purchase of 76.15% of Cimble has increased, but there are no other ramifications in terms of shareholding percentages or a continued debt guarantee of any kind. We are happy to just have you reply in the affirmative to this email if so.

Dkt. 137-4 at 4. In response, Zink said:

> Confirming your understanding of the 7.14% issue as set forth in both of your emails below. If the options are not exercised, then Cimble does not repay the loan and Kapexia gets no additional equity. It will not be debt forgiveness, so as to save Cimble the tax hit. Instead, the $125K will become part of the basis (acquisition cost) for the 7.14%.

*Id*. at 3. However, the text of the LOC specifically states:

> Notwithstanding anything to the contrary herein, or elsewhere, if Lender (1) does not elect to exercise both of the 6 Month Option and 18 Month Option in the parties Share Purchase Agreement *and (2) fails to bring the developed product contemplated between the parties to market after its completion, then the balance*

> *due under this Note shall be converted to equity* in Maker without any additional shares being issued to Lender.

Dkt. 70-2 at 4 (emphasis added). Therefore, Zink's alleged prior agreement with Defendants is directly inconsistent with the unambiguous terms of the LOC. Thus, the parol evidence rule precludes enforcement of Defendants' alleged agreement prior to the signing of the SPA. *See West*, 573 S.W.3d at 243. Even if the parol evidence rule did not apply, these emails only discuss the first requirement for the money to be converted into equity under the LOC, and neither email alludes to the second requirement. *See* Dkt. 70-2 at 4. Accordingly, summary judgment as to Plaintiffs' breach of contract claims is **DENIED**.

## B. COMMON LAW FRAUD

A plaintiff seeking to prevail on a common law fraud claim must show: (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). Alternatively, a plaintiff may also plead common law fraud by omission by showing: (1) a party concealed or failed to disclose a material fact within the knowledge of that party; (2) the party knew the other party was ignorant of the fact and did not have an equal opportunity to discover the truth; (3) the party intended to induce the other party to take some action by concealing or failing to disclose the fact; and (4) the other party suffered injury as a result of acting without knowledge of the undisclosed fact. *Halprin v. Fed. Deposit Ins. Corp.*, Case No. 5:13-CV-1042-RP, 2018 WL 3603118, at *2 (W.D. Tex. July 6, 2018) (citing *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001)); *see also TXI Operations, LP v. Pittsburgy & Midway Coal Mining Co.*, Case

No. 3:04-CV-1146-H, 2004 WL 2088911, at *2 (N.D. Tex. Sept. 8, 2004) (noting that omissions are actionable when the defendant is under a duty to disclose, including when a partial disclosure conveys a false impression).

Defendants argue summary judgment should be granted as to Plaintiffs' common law fraud claims as to all of Defendants' allegedly fraudulent conduct. *See* Dkt. 137 at 35–36. In their Second Amended Complaint, Plaintiffs allege Defendants engaged in the following acts as the basis for their common-law fraud and negligent misrepresentation claims:

(a)  Defendants misrepresented Cimble as having a value of $8.25 million;
(b)  Defendants misrepresented the value of LunarEYE patent royalties;
(c)  Defendants failed to disclose that Cimble was essentially dead at the time it sought to induce Whiteside to invest;
(d)  Defendants failed to disclose the existence of PTO proceedings that resulted in the invalidation of all claims of the '035 Patent;
(e)  Defendants failed to disclose that the '738 Patent had expired due to non-payment of maintenance fees;
(f)  Defendants falsely promised it would use all funds loaned by Whiteside and Autoficio under the LOC solely in furtherance of requested product development efforts; and
(g)  Defendants falsely promised it would pay back the funds loaned to it under the terms of the LOC.

Dkt. 70 at 8–9. The Court will address each of Plaintiffs' fraud claims in turn.

**1.   Cimble's Valuation of $8.25 Million**

Defendants argue Plaintiffs cannot show reliance on Defendants' allegation that Cimble was worth $8.25 million in the Presentation because months of due diligence occurred after the Presentation. *See* Dkt. 137 at 37. In response, Plaintiffs allege generally that Defendants misrepresented information concerning Cimble's financial and operational status by withholding information and using this as a starting point for Cimble's valuation. *See* Dkt. 142 at 25; Dkt. 192.

Plaintiffs provided evidence that Allen pondered Cimble having an internal asset sale and considered Cimble "essentially DOA" just one week after representing to Whiteside that it was

worth $8.25 million. Dkt. 142-12 at 2. Further, less than a month later, Barrett told Allen that Cimble needed "more than 300K for the year" when Kapexia increased its offer to $300,000. *See* Dkt. 142-13 at 2. As this evidence tends to show that Defendants were not forthcoming about Cimble's true financial position around the time of the Presentation, the Court finds that a genuine issue of material fact exists as to Plaintiffs' common law fraud claim that Defendants misrepresented Cimble as having a value of $8.25 million. Thus, summary judgment as to this claim is **DENIED**.

### 2. Value of LunarEYE Patent Royalties

Defendants argue summary judgment should be granted as to Plaintiffs' claim that Defendants misrepresented the value of the LunarEYE patent royalties because "Cimble's cards were all on the table with respect to the LunarEYE patent license, debts, and Cimble's royalty obligations" and Plaintiffs conducted no due diligence in connection with Cimble's intellectual property. *See* Dkt. 137 at 40. Plaintiffs argue that knowledge of the PTO proceedings would have led them to lower their valuation of Cimble because Cimble's paid-up royalties in LunarEYE patents were worth less with validity of the patent under challenge. *See* Dkt. 142 at 23–24. As discussed below, the Court finds that a genuine issue of material fact exists as to whether Defendants' failure to disclose the existence of PTO proceedings involving the '035 Patent amounted to fraud. As Plaintiffs argue that the value of the LunarEYE patent royalties was misrepresented in part by Defendants' failure to disclose the PTO proceedings, the Court finds that a genuine issue of material fact exists as to whether Defendants mispresented the value of the LunarEYE patent royalties. Therefore, summary judgment as to Plaintiffs' fraud claim based on Defendants valuation of the LunarEYE patent royalties is **DENIED.**

### 3.   Cimble's Financial State at Time of Investment

Defendants argue summary judgment should be granted as to Plaintiffs' claim that Defendants failed to disclose Cimble was essentially dead at the time it sought to induce Whiteside to invest because Whiteside knew that Cimble was cash poor before the Agreements were signed. *See* Dkt. 137 at 40. Plaintiffs argue Defendants misrepresented their ability to develop the promised product and failed to disclose their plan for Cimble to use Plaintiffs' funds to immediately pay down its line of credit to Allen. *See* Dkt. 142 at 27.

In an email to Allen less than a week before the Agreements were signed, Barrett stated that he was "in no way able to say with even 10% certainty that [Defendants] could do any of this." Dkt. 142-14 at 2. Additionally, Allen testified that Cimble "never made enough money to pay its bills," but Cimble used $237,000 of the money provided by Plaintiffs to pay off Cimble's line of credit to Allen one week after the funds were furnished. *See* Dkt. 142-4 at 17, 44–45. Allen admits that he probably did not disclose to Plaintiffs the timing in which Cimble was planning to pay off its line of credit to him. *See id*. at 45. Based on this evidence, the Court finds that a genuine issue of material fact exists as to whether Defendants misrepresented Cimble's financial state at the time the Agreements were signed. Therefore, summary judgment as to Plaintiffs' fraud claim based on Defendants' failure to disclose that Cimble was essentially dead at the time it sought to induce Whiteside to invest is **DENIED**.

### 4.   Existence of PTO Proceedings for '035 Patent

Defendants argue summary judgment should be granted as to Plaintiffs' claim that Defendants failed to disclose the existence of the PTO proceedings which resulted in the invalidation of all claims of the '035 Patent because the PTO proceedings were of no consequence to the execution of the SPA and the LOC. *See* Dkt. 137 at 42. Plaintiffs argue Defendants knew

about the pending PTO proceedings and knew the uncertainty of impending patent litigation affected the value of Cimble. *See* Dkt. 142 at 23–24. As the parties' arguments turn on the importance of the PTO proceedings for the '035 Patent in valuation of Cimble, the Courts finds that a genuine issue of material fact exists as to whether this constitutes fraud by Defendants. Thus, summary judgment as to Plaintiffs' fraud claim based on Defendants' failure to disclose the existence of the PTO proceedings that resulted in the invalidation of all claims of the '035 Patent is **DENIED**.

### 5.   Expiration of the '738 Patent

Defendants argue summary judgment should be granted as to Plaintiffs' claim that Defendants failed to disclose that the '738 Patent had expired due to non-payment of maintenances fees because the '738 Patent has not actually expired. *See* Dkt. 137 at 43. At the Hearing, Defendants requested that the Court take judicial notice of the United States Patent and Trademark Office payment history for the '738 Patent which shows that the fees have been paid ant the '738 Patent is current. *See* Dkt. 77-16 at 3. Moreover, Plaintiffs conceded that the '738 Patent has not expired. *See* Dkt. 192. As Plaintiffs concede that the '738 Patent has not expired, and the Court recognizes that the required maintenance fees were paid to the United States Patent and Trademark Office, the Court finds that summary judgment as to Plaintiffs' fraud claim based on the expiration of the '738 Patent is **GRANTED**.

### 6.   Use of Loaned Funds for Product Development and Cimble's Intent to Repay Loaned Funds

While Defendants argue summary judgment should be granted as to each of Plaintiffs' fraud claims, Defendants do not address Plaintiffs' claim that Defendants falsely promised Cimble would use all funds loaned by Whiteside and Autoficio under the LOC solely in furtherance of requested product development efforts. Likewise, Defendants failed to address Plaintiffs' claim

that Defendants falsely promised it would pay back the funds loaned to it under the terms of the LOC. To meet their burden in moving for summary judgment, Defendants must identify those portions of pleadings and summary judgment evidence which they believe demonstrate the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 325. As Defendants have failed to articulate any grounds for summary judgment on these fraud claims, the Court finds that summary judgment as to these claims is **DENIED**.

### C.  STATUTORY FRAUD

In order to show statutory fraud under Texas Business and Commerce Code § 27.01, a plaintiff must establish (1) a false representation of a past or existing material fact, that is made to a person for the purpose of inducing that person to enter a contract and is relied on by that person in entering into that contract; or (2) a false promise to do an act where the promise is material, made with the intention of not fulfilling it, to a person for the purpose of inducing them to enter into a contract, and relied on by the person entering the contract. TEX. BUS. & COM. CODE § 27.01(a). "A cause of action for statutory fraud differs from the common law cause of action only in that it does not require proof that the false representation was made knowingly or recklessly." *Robbins v. Copozzi*, 100 S.W.3d 18, 26 (Tex. App.—Tyler, 2002) (citing *Larsen v. Carlene Langford & Assocs., Inc.*, 41 S.W.3d 245, 259 (Tex. App.—Waco, 2001, *pet. denied*)).

As an initial matter, Defendants argue summary judgment should be granted as to Plaintiffs' statutory fraud claim because Plaintiffs are not parties to the Agreements. *See* Dkt. 137 at 43. However, "contractual privity between the litigating parties is not a requirement of statutory fraud." *Mid States Development, L.L.C. v. Fidelity National Title Ins. Co.*, Case No. 399CV1966M, 2001 WL 1172215, at *5 (N.D. Tex. Sept. 28, 2001). Thus, the Court finds that even if the parties were not in privity, summary judgment could not be granted on this ground.

Defendants further contend Sections 2, 3, 4.1, 4.2, and 4.8 of the SPA, when read together, make up a contractual disclaimer of reliance. *See* Dkt. 137 at 45. "When knowledgeable parties expressly discuss material issues during contract negotiations, but nevertheless elect to include a waiver-of-reliance provision, courts will generally uphold the contract." *Christian v. GK Development, Inc.*, Case No. 9:09CV-99, 2010 WL 1153842, at *4 (E.D. Tex. May 6, 2010) (quotations omitted). However, "facts may exist where the disclaimer lacks the requisite clear and unequivocal expression of intent necessary to disclaim reliance on the specific representations at issue." *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008) (quotations omitted). In determining whether a waiver-of-reliance provision is binding, "the court must look at both the contract itself and the totality of the circumstances, including whether: (1) the contract terms were negotiated, rather than boilerplate language; (2) [Plaintiff] was represented by counsel; (3) the parties' dealings were an arms-length transaction; (4) the parties were knowledgeable regarding business matters; and (5) the release language was clear." *Christian*, 2010 WL 1153842, at *5.

In reading the relevant provisions of the SPA together, the Court does not find that they amount to an unambiguous waiver of reliance. Section 2 of the SPA lists "true and complete" representations made by Cimble. Dkt. 70-1 at 4. Section 3 of the SPA lists representations made by Kapexia to Cimble under the SPA. *See id*. at 5. Section 4.1 states that the representations and warranties made under the SPA shall survive the execution and delivery of the SPA. *See id*. at 7. As described above, Section 4.2 is a successors and assigns clause. *See id*. Section 4.8 of the SPA states: "This Agreement constitutes the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled." Dkt. 70-1 at 8.

In arguing that the language of the SPA constitutes an explicit disclaimer of reliance, Defendants rely on *Christian v. GK Development, Inc.*, wherein the court found that the text of the contract contained a waiver of reliance, and thus, the plaintiff's statutory fraud claim was summarily dismissed. *See Christian*, 2010 WL 1153842, at *5. The contract in *Christian* states that no "inducements, representations, understandings or agreements have been made or relied upon" in the making of the contract, and neither party "has any right to rely on any other prior or contemporaneous representation" concerning the contract's subject matter. *Id*. at *1.

Unlike the contract in *Christian*, the SPA contains no clear waiver of reliance. In deciding whether a clause similar to Section 4.8 of the SPA constituted a waiver of reliance, the Supreme Court of Texas held that the parties to the contract "intended nothing more than the provisions of a standard merger clause," as the contract language did not include an express disclaimer of reliance. *Italian Cowboy Partners*, 341 S.W.3d at 334 ("Pure merger clauses, without an expressed clear and unequivocal intent to disclaim reliance or waive claims for fraudulent inducement, have never had the effect of precluding claims for fraudulent inducement."). As the SPA does not include any express language disclaiming reliance, the Court finds that the language of the SPA does not bar Plaintiffs' claim for statutory fraud. Thus, summary judgment as to Plaintiffs' statutory fraud claim is **DENIED**.

## D.  NEGLIGENT MISREPRESENTATION

Under Texas law, a claimant alleging negligent misrepresentation must show the following: (1) the representation is made by a defendant in the course of his business, or in a transaction in which the defendant has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff

suffers a pecuniary loss by justifiably relying on the representation. *Biggers v. BAC Home Loans Serv., LP*, 767 F. Supp. 2d 725, 734 (N.D. Tex. 2011) (quoting *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (internal quotations omitted)); *see also Verdin v. Fed. Nat'l Mortgage Ass'n*, 540 Fed. App'x 253, 255 (5th Cir. 2013).

Defendants advance identical arguments for summary judgment as to Plaintiffs' negligent representation claims as asserted regarding Plaintiffs' common law fraud claims. *See* Dkt. 137 at 46. As the Court has already addressed those arguments above, and granted in part and denied in part summary judgment as to Plaintiffs' common law fraud claims, the Court declines to address such arguments again. Thus, the Court finds summary judgment as to Plaintiffs' negligent misrepresentation claim based on Plaintiffs' claim that Defendants failed to disclose the '738 Patent had expired due to non-payment of maintenance fees is **GRANTED**, and summary judgment is **DENIED** as to all of Plaintiffs' remaining negligent misrepresentation claims.

## IV.   CONCLUSION

After a careful review of the record and the arguments presented, the Court is not convinced Defendants have met their burden of demonstrating that there is no genuine issue of material fact as to all of Plaintiffs' claims. Accordingly, Defendants' Motion for Summary Judgment (Dkt. 137) is hereby **GRANTED** as to Plaintiffs' common law fraud claim and negligent misrepresentation claim based on Defendants' alleged failure to disclose the '738 Patent had expired due to non-payment of maintenance fees. Summary judgement as to all of Plaintiffs' remaining claims is hereby **DENIED**.

**So ORDERED and SIGNED this 15th day of June, 2020.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

27